FLAUM, Circuit Judge,
dissenting.
I respectfully disagree with the analysis and conclusion of the majority. At the outset, I do not believe that the scenario presented in this case can be viewed as an arms-length, three-party transaction. Weimert, as president of IDI, was acting on behalf of IDI in negotiating the deal. Unlike a situation involving three independent parties, in the transaction at hand, the IDI board had every reason to expect that Weimert would fairly and honestly represent its interests. The record does not reflect an expectation at the start of negotiations- that Weimert would be entitled to equity or any sort of bonus arising out of the Chandler Creek deal. Thus, I cannot accept the, majority’s conclusion that this situation amounts to hard bargaining among disinterested parties, and that the IDI board received what it agreed to and expected in the Chandler Creek sale. In fact, IDI likely would have received a higher purchase price had Wei-mert not taken a bite out of the deal. IDI received roughly 96 percent, rather than 100 percent, of the purchase price due -to Weimert’s creation of equity for himself.
I also do not agree that this case is similar to a routine negotiation among buyers and sellers in which the parties benefit from deliberately false misrepresentations about their negotiating positions. Such situations, which the majority contends are customary and relatively harmless, entail actual arms-length transactions among independent parties. By *371 contrast, Weimert, the president of IDI, was not at arms-length; with the IDI board. Moreover, in the typical negotiation involving a buyer and seller, the parties are aware that they are solely bargaining with one another; in the cáse at hand, the IDI board had no reason to believe that it was also negotiating with Weimert, in addition to the potential buyers.
Although the final contract terms were disclosed when the IDI board considered and approved the deal, the evidence suggests that the IDI board only approved the deal because Weimert represented that it would not get done without his involvement. All of the board members later testified that they would not have voted to waive the conflict of interest and pay Weimert’s fee if they had known that the Burkes did not require his involvement. This evidence .undermines the notion that the IDI board simply agreed to the terms that were in plain view and received what it expected. Rather, the deal the board approved was based on misrepresentations by its own representative and the board would not have approved the deal if it had known the truth. Further, I find the .majority’s assertion that the final contract terms were “in fact discussed and negotiated by the interested parties” to be an incomplete portrayal of the facts, since the only parties to negotiate the letter of intent that the IDI board approved were Weimert, as IDI’s representative, and the Burkes. Although the final contract terms were slightly different than those initially approved by the board, that letter of intent formed the basis for a transaction in which the parties assumed and ultimately mandated Weimert’s participation.
If one focuses on Weimert’s misrepresentations to the IDI board while he was supposedly acting on its behalf, the materiality inquiry is different than the majority proffers. Even if Weimert’s statements to Kalka .and the Burkes — parties at arms-length — were closer to puffery, Weimert’s deception of the IDI board and his ABCW/AnchorBank supervisors was more insidious than mere bluffing.. Furthermore,., even assuming. Weimert’s participation was a non-core term of the deal, IDI was misled as to the amount it could receive for the property as well as Wei-mert’s interest in seeing the deal completed. Weimert’s misrepresentations induced the IDI board to approve the deal and were, therefore, material to the board’s decision. See Neder v. United States, 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).
Our case law also. supports the conclusion that Weimert’s misrepresentations to the Burkes were material to the IDI board’s decision to approve the deal. See United States v. Seidling, 737 F.3d 1155, 1160 (7th Cir.2013) (noting that “[i]n general, a false statement is material if it has a natural tendency to influence- or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed” (quoting Neder, 527 U.S. at 16, 119 S.Ct. 1827) (internal quotation marks omitted)). As mentioned previously, all of the board .members testified that they would not have voted to waive the conflict of interest and pay Weimert’s fee if they had known that the Burkes did not require his .involvement. Weimert’s statements were also material to his supervisors at AnchorBank, who testified that they would not have approved payment of his fee through bank payroll if it had, not been their understanding that Weimert had to be involved in the deal..
In sum, I conclude that Weimert committed wire fraud by deceiving his own company and taking a portion of the deal for himself. I am not unsympathetic to the majority’s commentary regarding the *372 “expansive glosses” on the mail and wire fraud statutes that have led to their liberal use by federal prosecutors, but Weimert’s deception of his own board meets the Supreme Court’s standard for materiality. Neder, 527 U.S. at 16, 119 S.Ct. 1827.
Additionally, even if one assumes that Weimert’s misrepresentations to the Burkes and Kalka did not, standing alone, rise to the level of criminal wire fraud, they do constitute such when combined with his statements to the IDI board. In United States v. Seidling, we held that wire fraud does not require that the false statement be made directly to the victim of the scheme — here, the IDI board. 737 F.3d at 1160. Seidling involved a misrepresentation to a third party that furthered the scheme to defraud the victim. Id. As in Seidling, Weimert’s misrepresentations to the Burkes and Kalka were integral to the success of his scheme to defraud IDI. Thus, no matter how insignificant these misrepresentations may have been to the Burkes and Kalka, I conclude that they still satisfy the requisite materiality element of wire fraud and support Weimert’s conviction.
Beyond whether this is properly viewed as an arms-length, three-party transaction, I am further concerned with the majority’s fiduciary duty analysis. The parties did not address the issue of fiduciary duty and, in any event, it is not central to the criminal wire fraud analysis. See United States v. Kwiat, 817 F.2d 440, 444 (7th Cir.1987). What is critical is Weimert’s position of trust as IDI’s president.
I also find questionable the majority’s framing of Weimert’s misrepresentations as a permissible employment compensation negotiating strategy. I do not view this as a situation in which Weimert, who had not been promised any sort of compensation arising out of the sale of Chandler Creek, was negotiating the terms of his employment at arms-length with the IDI board. Instead, Weimert was simultaneously representing and deceiving the IDI board for his own pecuniary gain.
For the foregoing reasons, I respectfully dissent and would affirm the judgment of conviction.